COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Kelsey and Senior Judge Overton
Argued at Chesapeake, Virginia


HOLLY JO SOUTH

v.        Record No. 2209-04-1

OPINION BY
JUDGE D. ARTHUR KELSEY
DECEMBER 20, 2005

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Charles D. Griffith, Jr., Judge

Brooke E. Woodzell, Assistant Public Defender (Office of the
Public Defender, on brief), for appellant.

Steven A. Witmer, Assistant Attorney General (Judith Williams
Jagdmann, Attorney General, on brief), for appellee.


Holly Jo South assaulted two United States Navy police officers serving at the Norfolk

Naval Base.  The trial court found her guilty of three counts of felony assault and battery of

law-enforcement officers under Code § 18.2-57(C).  South argues that the statute does not apply

to the federal officers she assaulted.  We agree, reverse the convictions, and remand for retrial on

the misdemeanor offenses of simple assault and battery under Code § 18.2-57(A).[1]

I.

A.   LAW-ENFORCEMENT OFFICERS UNDER CODE § 18.2-57

Code § 18.2-57(C) makes it a Class 6 felony to commit "an assault and battery against

another knowing or having reason to know that such other person is a law-enforcement officer as

defined hereinafter . . . ."  Subsection E lists the categories of law-enforcement officers included

within the reach of the statute:

--------

[1] The trial court also convicted South of driving under the influence of alcohol and
assaulting a deputy employed by the Norfolk Sheriff's Office.  South did not challenge those
convictions.

As used in this section: "Law-enforcement officer" means any full-time or part-time *employee of a police department or sheriff's office which is part of or administered by the Commonwealth or any political subdivision thereof*, who is responsible for the prevention or detection of crime and the enforcement of the penal, traffic or highway laws of this Commonwealth, and any conservation officer of the Department of Conservation and Recreation commissioned pursuant to § 10.1-115, and game wardens appointed pursuant to § 29.1-200, and such officer also includes jail officers in local and regional correctional facilities, all deputy sheriffs, whether assigned to law-enforcement duties, court services or local jail responsibilities, auxiliary police officers appointed or provided for pursuant to §§ 15.2-1731 and 15.2-1733 and auxiliary deputy sheriffs appointed pursuant to § 15.2-1603.

(Emphasis added.) If a victim does not fit within one of the listed categories (conservation officers, game wardens, jail officers, deputy sheriffs, and auxiliary officers), the statute does not apply unless the law-enforcement officer is an "employee of a police department or sheriff's office which is part of or administered" by the Commonwealth or local government. Id.

South assaulted two federal police officers employed by the United States Navy. Neither officer was an employee of a police department or sheriff's office that was part of, or administered by, the Commonwealth or any local government. The Navy employed, paid, and controlled both federal officers. Under the plain meaning of Code § 18.2-57(E), the federal officers do not fit within the statutory definition. "It is a fundamental principle of statutory construction that *expressio unius est exclusio alterius*, or 'where a statute speaks in specific terms, an implication arises that omitted terms were not intended to be included within the scope of the statute.'" Conkling v. Commonwealth, 45 Va. App. 518, 522, 612 S.E.2d 235, 237 (2005) (quoting Commonwealth v. Brown, 259 Va. 697, 704-05, 529 S.E.2d 96, 100 (2000)).

The Commonwealth argues that no policy justification supports the exclusion of federal police officers from the state felony assault and battery statute. Perhaps not — but when a statutory text speaks clearly on a subject, "effect must be given to it regardless of what courts think of its wisdom or policy." Temple v. City of Petersburg, 182 Va. 418, 423, 29 S.E.2d 357,

358 (1944). We may not extend the meaning of the statute "simply because it may seem to us that a similar policy applies, or upon the speculation that, if the legislature had thought of it, very likely broader words would have been used." Franklin & Pittsylvania Ry. Co. v. Shoemaker, 156 Va. 619, 624, 159 S.E. 100, 102 (1931) (quoting McBoyle v. United States, 283 U.S. 25, 27 (1931) (Holmes, J.)).

The Commonwealth also contends our interpretation misses entirely the intent of the statute, which is to impose an enhanced punishment on those who assault law-enforcement officers and thereby deter violence against them. Here again, we do not in the slightest denigrate this perceived legislative purpose.[2] But the "question here is not what the legislature intended to enact, but what is the meaning of that which it did enact. We must determine the legislative intent by what the statute says and not by what we think it should have said." Carter v. Nelms, 204 Va. 338, 346, 131 S.E.2d 401, 406 (1963). When it chooses to do so, the General Assembly includes "law-enforcement agents of the Armed Forces of the United States" and other federal officers within the statutory meaning of "law-enforcement officer." See, e.g., Code § 18.2-308(M); Code § 18.2-433.1.[3] It simply did not choose to do so in Code § 18.2-57(E).

## B. RECIPROCAL AGREEMENTS UNDER CODE § 15.2-1726

The Commonwealth also asserts that the federal officers possess arrest powers to enforce state law pursuant to a "reciprocal agreement" with the City of Norfolk authorized by Code § 15.2-1726. They should be treated, the Commonwealth argues, as the "functional equivalent"

---

[2] The federal criminal code directly addresses this subject. See 18 U.S.C. § 111(a)(1) (criminalizing assaults on federal officers engaged in "the performance of official duties").

[3] See also Code § 15.2-915.2 (exempting "law-enforcement officers or military personnel" from the prohibition of carrying a loaded firearm); Code § 18.2-85 (exempting members of the "armed forces of the United States" and "law-enforcement officers" from the prohibition on manufacturing or possessing explosive devices); Code § 18.2-287.4 (exempting "law-enforcement officers" and "military personnel" from the prohibition of carrying certain loaded firearms in public places).

of state or local law enforcement officers for purposes of the assault-and-battery statute. We assume, without deciding, a "reciprocal agreement" exists between the City of Norfolk and the United States Navy.[4] Even with that assumption, the Commonwealth's argument has no merit.

Code § 18.2-57(E) incorporates by reference various officers identified in other provisions of state law — such as conservation officers under Code § 10.1-115, game wardens under Code § 29.1-200, auxiliary police officers under Code §§ 15.2-1731, 15.2-1733, and auxiliary deputy sheriffs under Code § 15.2-1603. Yet subsection E conspicuously omits any reference either to federal officers generally or to those specifically subject to reciprocal agreements under Code § 15.2-1726 (formerly codified at Code § 15.1-131.3), a statute that had been on the books for more than a decade before the enactment of Code § 18.2-57(E) (formerly codified at Code § 18.2-57.1). This omission has continued despite the many amendments to Code § 18.2-57 over the years.[5]

Nor does Code § 15.2-1726, of its own force, somehow incorporate itself into the criminal assault-and-battery statute. The relevant part of the statute provides:

---

[4] At trial, the Commonwealth did not introduce a reciprocal agreement into evidence. Nor did any witnesses once mention the existence of any agreement of any sort. The federal officers testified only that, as they understood it, their "authority" to arrest under state law came "[f]rom the City of Norfolk." Similarly, the word "agreement" never appears in any comments by the prosecutor during the trial. She argued only that the federal officers have a "special conservancy under a statute . . . that allows them to issue summons." When summarizing the evidence, however, the trial judge mistakenly recalled the federal officers testifying that their arrest powers stemmed from "a mutual agreement" with the City of Norfolk. Despite these evidentiary infirmities, we assume a reciprocal agreement under Code § 15.2-1726 exists only because South does not challenge that issue on appeal.

[5] This section's definition of "law-enforcement officer" was originally located in Code § 18.2-57.1 and was limited at its inception to "full-time employee[s] of a police department or sheriff's office which is part of or administered by the Commonwealth or any political subdivision thereof." 1983 Va. Acts, ch. 578. That definition was modified twice before 1997 when it was relocated to Code § 18.2-57. See 1994 Va. Acts, ch. 205 (adding conservation officers); 1994 Va. Acts, ch. 427 (adding part-time employees, auxiliary police officers, and auxiliary deputy sheriffs); 1997 Va. Acts, ch. 833. Since then, the definition has been changed twice more. See 2000 Va. Acts, ch. 288 (adding game wardens, jail officers, and deputy sheriffs); 2001 Va. Acts, ch. 129 (adding jail officers of regional facilities).

- 4 -

Any locality may, in its discretion, enter into a reciprocal agreement with any other locality, any agency of the federal government exercising police powers, police of any state-supported institution of higher learning appointed pursuant to § 23-233, or with any combination of the foregoing, for such periods and under such conditions as the contracting parties deem advisable, for cooperation in the furnishing of police services. Such localities also may enter into an agreement for the cooperation in the furnishing of police services with the Department of State Police. The governing body of any locality also may, in its discretion, enter into a reciprocal agreement with any other locality, or combination thereof, for the consolidation of police departments or divisions or departments thereof. Subject to the conditions of the agreement, all police officers, officers, agents and other employees of such consolidated or cooperating police departments shall have the same powers, rights, benefits, privileges and immunities in every jurisdiction subscribing to such agreement, including the authority to make arrests in every such jurisdiction subscribing to the agreement; *however*, no police officer of any locality shall have authority to enforce federal laws unless specifically empowered to do so by statute, and *no federal law-enforcement officer shall have authority to enforce the laws of the Commonwealth unless specifically empowered to do so by statute*.

(Emphasis added).

A reciprocal agreement under Code § 15.2-1726 cannot, by itself, contractually confer arrest authority on federal officers to enforce state law. Immediately after recognizing the reciprocal power of arrest, the statute includes a "however" proviso which confirms that, no matter what the agreement may say, "no federal law-enforcement officer shall have authority to enforce the laws of the Commonwealth unless specifically empowered to do so by statute." Id. All the more, we question whether a reciprocal agreement under Code § 15.2-1726 can contractually confer upon a federal officer the "privilege" of special victim status reserved by the legislature solely for state and local officers under Code § 18.2-57(E).[6]

---

[6] Though other federal-state inter-governmental statutes exist, none apply to this case. See, e.g., Code § 15.2-1728 (authorizing a "mutual aid agreement" over lands subject to the "exclusive jurisdiction" of the federal government); Code § 15.2-1729 (authorizing the "governing body of any county" to enforce county ordinances and state law on federal property). No evidence established the place of South's arrest as being subject to exclusive federal jurisdiction, making Code § 15.2-1728 inapplicable. See generally Campbell v. Commonwealth, 39 Va. App. 180, 188, 571 S.E.2d 906, 910 (2002) (recognizing a "presumption in favor of

We need not examine the question further, however, because nothing in the record discloses what the putative agreement in this case said. The Commonwealth did not introduce the agreement in evidence, or provide testimony from any witness about specific contractual terms, or make any unchallenged avowal about the subject. And whatever may be included among the "powers, rights, benefits, privileges and immunities" alluded to in the statute, they still remain "[s]ubject to the conditions of the agreement," as Code § 15.2-1726 makes clear.[7] Without that agreement or some testimonial evidence of its terms, we cannot assume anything in it purports to transform the federal officers South assaulted into employees "of a police department or sheriff's office which is part of or administered" by the Commonwealth or local government for purposes of Code § 18.2-57(E).

In the end, the Commonwealth's argument is little more than a request that we add Code § 15.2-1726 to the list of statutes incorporated by reference by Code § 18.2-57(E). Granting this request would require us to "judicially graft" an unrelated provision into the statute "under the subtle guise of judicial interpretation," Washington v. Commonwealth, 46 Va. App. 276, 283, 616 S.E.2d 774, 778 (2005) (*en banc*) (citations and internal quotation marks omitted) — an exercise in which we have neither the authority nor the inclination to engage.

---

concurrent jurisdiction" over federal lands in Virginia). And the City of Norfolk is not a county, making Code § 15.2-1729 inapplicable.

[7] The phrase "powers, rights, benefits, privileges and immunities" in Code § 15.2-1726 is not self-defining. Phrases like this usually describe the common law and statutory powers to seize persons and property, the protection from legal liability accompanying the proper performance of official duties, the employment-related accoutrements of the office, and legal entitlements of like kind. See, e.g., Code § 44-75.1:1(A) (describing the "benefits, privileges, immunities, or rights" of national guard personnel); Blackmon v. Lee, 12 F.R.D. 411, 412 (D.D.C. 1952) (noting the "rights, benefits, privileges or immunities" granted by Congress to veterans), aff'd, 205 F.2d 13 (D.C. Cir. 1953).

II.

The trial court erred as a matter of law in convicting South under Code § 18.2-57(C) of felony assault and battery of the United States Navy police officers. We reverse these three felony convictions and remand the case for retrial on the lesser-included misdemeanor offenses of simple assault and battery under Code § 18.2-57(A).[8]

Reversed and remanded.

---

[8] South does not challenge any other aspect of her assault-and-battery convictions. "When an appellant successfully challenges the sufficiency of the evidence on some (but not all) aspects of his conviction, we must determine if the proven elements of the original charge qualify as a lesser-included offense. If so, the appropriate remedy on appeal is a reversal of the conviction on the greater charge and a remand of the lesser charge for retrial — assuming the Commonwealth, in its prosecutorial discretion, chooses to go forward on the lesser charge." Crowder v. Commonwealth, 41 Va. App. 658, 666, 588 S.E.2d 384, 388 (2003); see also Gorham v. Commonwealth, 15 Va. App. 673, 678, 426 S.E.2d 493, 496 (1993).

Humphreys, J., dissenting.

I believe that Code § 18.2-57, when read in conjunction with Code § 15.2-1726, entitles these federal officers to "the same powers, rights, benefits, privileges and immunities while acting in the performance of their duties," including the fullest protection of the law when carrying out those duties. As a result, the statutory definition of "law-enforcement officer" contained in Code § 18.2-57 must therefore also encompass federal officers who have entered into, and are acting pursuant to, a contractual mutual assistance arrangement with a state or local law enforcement agency. Accordingly, I respectfully dissent.

I.

South contends that, because the United States naval base police officers were not "law-enforcement officers" as defined by Code § 18.2-57, she cannot be convicted of the offense of assaulting a police officer. The majority correctly points out that "[n]either naval base officer was an employee of a police department or sheriff's office that was part of, or administered by, the Commonwealth or any local government. The Navy employed, paid, and controlled both federal officers." However, I disagree with the majority's conclusion that the ability of the Commonwealth to charge South with the enhanced assault charge rises and falls solely with the statutory definition provided in Code § 18.2-57(C).

Clearly, federal officers are not specifically listed in Code § 18.2-57(C). And, without further analysis, it would seem that the principle of *"expressio unius est exclusio alterius"* applies, limiting us to the list of individuals delineated within that Code section. However, because the Commonwealth introduced unchallenged evidence of a contractual agreement between the City of Norfolk and the federal government, I believe that this Court must also take

into consideration the provisions of Code § 15.2-1726 when determining whether these officers are afforded the privilege of claiming "special victim status" under Code § 18.2-57.[9]

### A. APPLICABLE RULES OF STATUTORY CONSTRUCTION WHEN CONSIDERING MULTIPLE STATUTES

When this Court is faced with an issue of statutory construction, we are, as the majority acknowledges, bound by the "plain meaning rule." See Brown v. Lukhard, 229 Va. 316, 321, 330 S.E.2d 84, 87 (1985). In other words, if the statute is clear on its face, we need not resort to rules of statutory construction, but rather, we must give full effect to the plain meaning of the words chosen by the legislature. Id.[10] However, if the statutory language is ambiguous, or if two statutes seem to be in conflict, as is the case here, we must employ the rules of statutory construction. Id.; see also Buzzard v. Commonwealth, 134 Va. 641, 653, 114 S.E. 664, 667 (1922).

When resorting to the rules of statutory construction, our overriding inquiry focuses upon ascertaining the intention of the lawmakers. Buzzard, 134 Va. at 653, 114 S.E. at 667. The "intention [of the legislature] must be gathered from the words used, but unreasonable or absurd results must not be reached by too strict adherence to literal interpretation." Id. Statutes must be considered together, and the literal meaning of separate statutes, if in conflict, "must yield to a reasonable and fair interpretation to be gathered from the context, the subject matter and the reason and spirit of the law." Id. Moreover, "[t]he doctrine of *pari materia* teaches that statutes

---

[9] The majority uses the term "special victim status" to refer to the "privilege" conveyed to law-enforcement officers under Code § 18.2-57. For consistency, I will adopt this terminology.

[10] Under the "plain meaning" rule, "if statutory language is not ambiguous but has a usual and plain meaning, rules of construction do not apply and resort to legislative history is both unnecessary and improper." Marsh v. Richmond, 234 Va. 4, 11, 360 S.E.2d 163, 167 (1987). Thus, as long as the words are not ambiguous, and as long as there is no conflict when the statute is read in conjunction with another, we are restricted to the words used within the statute. As such, under the majority's "plain meaning" approach, we should not look to the many amendments of Code § 18.2-57 and speculate as to the legislative intent behind them.

are not to be considered as isolated fragments of law, but as a whole, or as parts of a great, connected homogenous system, or a simple and completed statutory arrangement." Commonwealth v. Wallace, 29 Va. App. 228, 234, 511 S.E.2d 423, 425 (1999) (quoting Moreno v. Moreno, 24 Va. App. 190, 197, 480 S.E.2d 792, 796 (1997)) (internal quotations omitted). Therefore, "proper construction seeks to harmonize the provisions of the statute both internally, *and in relation to other statutes*." Mayhew v. Commonwealth, 20 Va. App. 484, 489, 458 S.E.2d 305, 307 (1995) (citations omitted) (emphasis added).

### B. READING CODE § 18.2-57 IN CONJUNCTION WITH CODE § 15.2-1726

In this case, the Commonwealth produced evidence—without objection or other evidence to the contrary—that the City of Norfolk and the federal government maintained a mutual aid agreement, pursuant to state law, by which Norfolk Naval Base police officers had the authority to enforce and uphold the laws of the Commonwealth.

According to Code § 15.2-1726,

> Any locality may, in its discretion, enter into a reciprocal agreement with any other locality, any agency of the federal government exercising police powers, police of any state-supported institution of higher learning appointed pursuant to § 23-233, or with any combination of the foregoing, for such periods and under such conditions as the contracting parties deem advisable, for cooperation in the furnishing of police services . . . . *Subject to the conditions of the agreement, all police officers, officers, agents and other employees of such consolidated or cooperating police departments shall have the same powers, rights, benefits, privileges and immunities in every jurisdiction subscribing to such agreement*, *including the authority to make arrests* in every such jurisdiction subscribing to the agreement; however, no police officer of any locality shall have authority to enforce federal laws unless specifically empowered to do so by statute, and no federal law-enforcement officer shall have authority to enforce the laws of the Commonwealth unless specifically empowered to do so by statute.

(Emphasis added). In other words, a locality may enter into a mutual aid agreement with the federal government, and absent any language in the agreement to the contrary, the statute itself

gives the federal officers all "powers, rights, benefits, *privileges* and immunities," including the power to arrest, that are conferred upon the law enforcement officers of the contracting jurisdiction. (Emphasis added).

However, the majority offers several reasons why Code § 18.2-57, in combination with Code § 15.2-1726, does not provide these officers with the privilege to charge South with the enhanced assault charge. For the reasons that follow, I disagree with each.

### 1. The Existence of a Mutual Aid Agreement

Although the record is clear that the federal officers had arrest powers, the majority questions the existence of an agreement between the City of Norfolk and the federal government, stating, "[w]e assume, without deciding, a 'reciprocal agreement' exists between the City of Norfolk and the United States Navy."[11] The majority then goes on to state that even if an agreement does, in fact, exist, "Code § 15.2-1726 cannot, by itself, confer arrest authority on federal officers to enforce state law."

However, the majority's interpretation of Code § 15.2-1726 joins two different portions of the statute together that— when read in accordance with the "plain-meaning rule"— the legislature clearly intended to make distinguishable. Specifically, the power to arrest and the power to enforce the laws of the Commonwealth are two different propositions. See Lukhard, 229 Va. at 321, 330 S.E.2d at 87 (addressing the "plain-meaning" rule); see also Code § 15.2-1726.

---

[11] The arrest warrants issued to South were styled "Commonwealth of Virginia Warrant of Arrest." Because the officers' "authority" to arrest under state law came "[f]rom the City of Norfolk," and because the officers validly arrested South under color of the authority of the Commonwealth, we must assume they were authorized to do so pursuant to a mutual aid agreement. Moreover, although the majority questions whether these federal officers received the power to issue summons pursuant to a mutual aid agreement, neither the validity of the arrest, nor the officers' power to issue the summons are contested on appeal.

The majority argues that Code § 15.2-1726 states that, no matter what the mutual aid agreement may say, "'no federal law-enforcement officer shall have authority to enforce the laws of the Commonwealth unless specifically empowered to do so by statute.'" This may be true. However, because Code § 15.2-1726, does, by itself, confer upon these officers "the authority to make arrests" when a mutual aid agreement exists, we need not even go so far as to ask whether these officers had the power "to enforce the laws of the Commonwealth." Rather, because the officers had the power to arrest, which derived from a mutual aid agreement between the City of Norfolk and the federal government, they had the same "powers, rights, benefits, *privileges* and immunities" of their counterparts employed directly by the Commonwealth. (Emphasis added).

Therefore, in viewing this evidence in the light most favorable to the Commonwealth, I believe this Court is compelled to find that the federal officers' ability to arrest South was established pursuant to a mutual aid agreement between the City of Norfolk and the federal government, as allowed by Code § 15.2-1726.

### 2. *Failure to Offer the Agreement Into Evidence*

The majority also suggests that, because the Commonwealth failed to offer the actual agreement between the City of Norfolk and the federal government into evidence, "we cannot assume anything in it purports to transform the federal officers South assaulted into employees of a police department or sheriff's office which is part of or administered by" the Commonwealth. In other words, the majority contends that we cannot consider the agreement because the Commonwealth did not satisfy its burden of proof with regard to the charged offense.

Although it is true that, "[t]o satisfy the due process requirements of the Federal Constitution, the prosecution must bear the burden of proving all elements of the offense beyond a reasonable doubt," Stokes v. Warden, Powhatan Correctional Center, 226 Va. 111, 117, 306 S.E.2d 882, 886 (1983) (quoting In Re Winship, 397 U.S. 358, 363 (1970)), and while it would

- 12 -

certainly have made our task easier had the Commonwealth offered the agreement as an exhibit,

I disagree with the majority's implicit conclusion that the Commonwealth completely failed to

prove the existence of such an agreement.  Specifically, the Commonwealth presented

uncontroverted testimony, by both arresting officers, that a cooperative agreement existed that

gave them the power to arrest and issue summons by the City of Norfolk.  Moreover, in ruling on

the motion to strike, the trial court stated,

> [T]hey operate under permission from the City of Norfolk—this
> political subdivision that these events occurred in—to lawfully
> execute and issue summons and arrests within this jurisdiction.
> That has been unchallenged . . . . I think the testimony of the
> officers effectively said just this – they didn't get into all the
> details because it wasn't charged.  They said they got authority
> from the City, and they have a mutual [aid] agreement with the
> City, and there is no challenge to that by the evidence, and
> therefore, I will deny your motion to strike.

The Commonwealth's failure to introduce the agreement itself, although arguably in

contravention of the best evidence rule, does not, in the absence of an objection to that effect,

preclude either the trial court or this Court from finding that the evidence establishes that the

contract did, in fact, exist.

In Virginia, the best evidence rule provides that "where the contents of a writing are

desired to be proved, the writing [the primary evidence] itself must be produced or its absence

sufficiently accounted for before other evidence of its contents can be admitted."  Randolph v.

Commonwealth, 145 Va. 883, 889, 134 S.E. 544, 546 (1926); Butts v. Commonwealth, 145 Va.

800, 816, 133 S.E. 764, 769 (1926).  If the trier of fact concludes with reasonable certainty that

the document existed and that it is unavailable for admission at trial, testimony about its contents

is admissible, and any remaining disputes center on the weight to be given the evidence, not its

admissibility.  See, e.g., Foley v. Commonwealth, 8 Va. App. 149, 164-65, 379 S.E.2d 915, 924

(1989).  However, the rules of evidence require counsel to object in order for the court to apply

- 13 -

this rule.  See, e.g., Ohree v. Commonwealth, 26 Va. App. 299, 494 S.E.2d 484 (1998).  In this case, however, South failed to raise any objection to the introduction of the officers' testimony regarding the agreement between the City of Norfolk and the federal government.  And, although such an objection may have been well taken, it is not the province of this Court to consider on appeal an issue that was not preserved below.  See Rule 5A:18.  Thus, absent any objection from defense counsel, or any affirmative evidence that the contract did not exist, I would hold that the Commonwealth presented sufficient evidence from which the trial court could infer that the agreement existed.

Therefore, in viewing this evidence in the light most favorable to the Commonwealth as required by the appellate standard of review, we can and should find that a contractual agreement existed that provided these officers with the same "powers, rights, benefits, *privileges* and immunities" as their colleagues that are employed directly by the Commonwealth or its political subdivisions.  Code § 15.2-1726 (emphasis added).

### 3.  The Terms of the Contractual Relationship

The majority also questions "whether a reciprocal agreement under Code § 15.2-1726 can contractually confer upon a federal officer the 'privilege' of special victim status," and, even if the agreement did exist, whether it would "transform" the federal officers into an employee of the Commonwealth for purposes of Code § 18.2-57.

However, nothing in the statute requires such a "transformation" in order for the contracting officer to receive the "rights, benefits, *privileges* and immunities" that the statute provides.  Id. (emphasis added).  Rather, the contractual relationship is a mechanism by which a local entity, in this case, the City of Norfolk, in conjunction with agencies of the federal government, can efficiently and effectively cooperate in the furnishing of police services, while simultaneously providing the officers of the contracting agencies with the same authority and

- 14 -

benefits as their local counterparts.  These benefits are, as the statute indicates, the same "rights,

benefits, *privileges* and immunities" of the local officers.  Id. (emphasis added).

Although the majority suggests that these terms are not "self-defining," and are usually

used to "describe the common law and statutory powers to seize persons and property, the

protection from legal liability accompanying the performance of official duties . . . and legal

entitlements of the kind," we must begin our interpretation of every statute by discerning the

plain meaning of the words within it.  See Lukhard, 229 Va. at 321, 330 S.E.2d at 87.

According to Black's Law Dictionary 1215 (7th ed. 1999), a privilege is "a *special legal

right*, exemption, or immunity granted to a person or class of persons."  (Emphasis added).  In

giving effect to the plain meaning of the words chosen by the legislature, as we must, the

legislature's use of the word "privilege" connotes that this statute provides contracting officers

with "special legal right[s]."[12]  Id.  Clearly, I agree with the majority that, "it is our duty to take

the words which the legislature has seen fit to employ and give to them their usual and ordinary

signification, and having thus ascertained the legislative intent, to give effect to it."  Saville v.

Va. Ry. & P. Co., 114 Va. 444, 452-53, 76 S.E. 954, 957 (1913).  To that end, we must give

effect to the meaning of the word "privilege" when Code § 18.2-57 and § 15.2-1726 are read

together.

Accordingly, I would hold that the "special legal rights," bestowed upon the federal

officers by Code § 15.2-1726 by virtue of the cooperative agreement, give these federal officers

the "privilege" of special victim status under Code § 18.2-57, thus providing the same level of

deterrent effect conferred by the enhanced penalty for those who assault the law enforcement

officers of the Commonwealth.  I respectfully suggest that the legislature did not intend that

---

[12] The majority contends the legal rights afforded these officers would be of the kind
addressed in Code § 44-75.1:1(A), and were not meant to afford these officers special victim
status under an "unrelated" criminal statute.

these officers would be afforded the "special legal right" of claiming protection from legal liability accompanying the good faith performance of their duties, but in turn would not be afforded the "special legal right" of claiming the special victim status available under Code § 18.2-57.

### 4. Jurisdiction

Lastly, in footnote 2, the majority seems to suggest that deterring violence against federal officers, who are contractually authorized to enforce state law, may only be done through the federal court system pursuant to 18 U.S.C. § 111(a)(1). Although South could certainly have been charged in federal court with the crime of assaulting a federal officer, nothing prevents the Commonwealth from pursuing a cause of action that is a violation of state law. More specifically, where a state shares concurrent jurisdiction with the federal government over an area where a state cause of action arises, that state court is the proper forum for deciding the case. See, e.g., Gay v. Commonwealth, 10 Va. App. 229, 230-31, 391 S.E.2d 737, 738 (1990) (holding the Virginia Beach Circuit Court had concurrent jurisdiction over Little Creek Naval Amphibious Base for traffic violations). Accordingly, in contrast to the assertion made by my colleagues, I would hold that the Commonwealth has not only the jurisdiction to pursue this claim, but also an overriding interest in protecting the officers it contracts with to uphold the laws of the Commonwealth.

### II.

In the present case, we are presented with two statutes. Although South urges us to strictly construe the meaning of "law-enforcement officer" as defined solely by Code § 18.2-57, this Court must also consider Code § 15.2-1726. In reading these two statutes together, so as to discern "the true intention of the Legislature, and to adopt that sense of the words which harmonizes best with the context, and promotes in the fullest manner the apparent policy and

- 16 -

objects of the Legislature," <u>Northrop v. Richmond</u>, 105 Va. 335, 339-40, 53 S.E. 962, 963 (1906) (internal quotations omitted), I conclude that the General Assembly intended to give federal officers—such as those involved in this case—the same level of protection from criminal acts as is afforded their law enforcement colleagues employed by the Commonwealth, its cities, and its counties. Because I would affirm the convictions, I respectfully dissent.